# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| WP COMPANY LLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 22-01138 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 19, 20 |
| | : | | |
| CENTRAL INTELLIGENCE AGENCY, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This case arises out of a Freedom of Information Act ("FOIA") dispute between Plaintiff WP Company LLC (the "Washington Post" or the "Post") and Defendant the Central Intelligence Agency (the "CIA"). The Washington Post seeks 56 documents known as "CIA Histories," records that examine a range of subjects related to U.S. foreign relations and intelligence operations from the 1940s through the 1970s. *See* Compl. at ¶ 21, ECF No. 1. The CIA has released some of the CIA Histories "in full or part [but] withheld other records, as well as information within certain records, pursuant to [FOIA] Exemptions 1, 3, and/or 6." Mem. P&A Supp. Mot. Summ. J. ("MSJ") at 3, ECF No. 19-1. The Washington Post believes that the CIA should have released additional records and sued the CIA to compel disclosure.

Before the Court are the CIA's Motion for Summary Judgment, *see generally* MSJ, and the Washington Post's combined Cross-Motion for Summary Judgment and Opposition to the CIA's motion, *see generally* Mem. P&A Supp. Mot. Summ. J. and Opp'n MSJ ("Cross-MSJ"), ECF No. 20-1. The CIA filed a combined reply in support of its motion and opposition to the

Washington Post's cross-motion ("Def.'s Reply"), ECF No. 22, and the Post filed a reply to the

CIA's opposition ("Pl.'s Reply"), ECF No. 24.  For the following reasons, the Court grants in

part and denies in part the CIA's motion for summary judgment and grants in part and denies in

part the Washington Post's cross-motion for summary judgment.

## II.  FACTUAL BACKGROUND

The Washington Post submitted a FOIA request for 56 "CIA Histories."  Compl. at ¶ 2.

The CIA Histories include (1) documents specifically requested by the 1975 Senate Select

Committee to Study Governmental Operations with Respect to Intelligence Activities,[1] (2)

documents relevant to the Committee's mandate but not specifically produced to the committee,

and (3) additional documents later identified by the CIA pursuant to the President John F.

Kennedy Assassination Records Collection Act of 1992.  *See id.* at ¶ 21; Cross-MSJ at 5–6.  The

Post contends that these documents "address topics of clear historical interest and events of more

than a half a century ago."  Cross-MSJ at 1.  The CIA acknowledged receipt of the Washington

Post's FOIA request but did not initially produce any of the requested records.  *See* Compl. at

¶¶ 22–23.  Accordingly, the Post brought this suit seeking declaratory and injunctive relief to

compel the CIA to release the records.  *See id.* at ¶¶ 34–35; Cross-MSJ at 6.  After the Post filed

suit, the CIA eventually explained that it was conducting a related search for records as part of a

periodic release of documents through the National Archives and Records Administration that it

believed "may substantially overlap with any search for records responsive to the Post's request"

---

[1] The Senate Select Committee was established to "investigate federal intelligence
operations and determine 'the extent, if any, to which illegal, improper, or unethical activities
were engaged in by any agency of the Federal Government.'"  *Senate Select Committee to Study
Governmental Operations with Respect to Intelligence Activities, Notable Senate Investigations*,
U.S. SENATE HIST. OFF., https://www.senate.gov/about/resources/pdf/church-committee-full-
citations.pdf (last visited Mar. 5, 2024)(quoting S. Res. 21, 94th Cong. § 1(a)(1975)).

and that "[a]fter [the] CIA has finished processing and releasing records from that search, it w[ould] then conduct a search for records responsive to the Post's request that the earlier search did not turn up."  Joint Status Report of June 15, 2022 at 1–2, ECF No. 10.  The CIA eventually located 34 out of the 56 documents requested by the Washington Post.  *See* Joint Status Report of May 5, 2023 at 2, ECF No. 17.[2]  The CIA produced some of those 34 records in full or in part but withheld others citing FOIA Exemptions 1, 3, and 6.  *See* MSJ at 1–3; Cross-MSJ at 1.  The parties disagree about whether the CIA conducted an adequate search for records and whether the CIA's FOIA withholdings were justified for the records it did locate.  Accordingly, the parties filed cross-motions for summary judgment which are now ripe.  *See generally* MSJ; Cross-MSJ.

### III.  LEGAL STANDARD

The Freedom of Information Act "sets forth a policy of broad disclosure of Government documents in order 'to ensure an informed citizenry, vital to the functioning of a democratic society.'"  *FBI v. Abramson*, 456 U.S. 615, 621 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)).  "[D]isclosure, not secrecy, is the dominant objective of the Act."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).  Hence, FOIA "mandates release of properly requested federal agency records, unless the materials fall squarely within one of nine statutory exemptions."  *Hunton & Williams LLP v. EPA*, 346 F. Supp. 3d 61, 72 (D.D.C. 2018) (citing *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011)).  "[E]ven if some materials from the requested record are exempt from disclosure, any reasonably segregable information from

---

[2] The Court observes that there is some inconsistency regarding the number of documents the CIA located.  *Compare* Joint Status Report of Sept. 15, 2022 at 1, ECF No. 11 (34 documents), *and* Joint Status Report of May 5, 2023 at 2, ECF No. 17 (34 documents), *with* Blaine Decl. at ¶ 9, ECF No. 19-3 (32 documents).

those documents must be disclosed after redaction of the exempt information," unless the non-exempt portions are "inextricably intertwined with exempt portions." *Id.* (internal quotation marks omitted) (quoting *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002)).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citation omitted). An agency is entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates "that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017) (citation omitted). "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure,' while the 'burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted) (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (alterations in original)).

To carry its burden with respect to the adequacy of its search, "an agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested, which it can do by submitting a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Shapiro v. U.S. Dep't of Just.*, 40 F.4th 609, 612–13 (D.C. Cir. 2022), *cert. denied sub nom. Shapiro v. Dep't of Just.*, 143 S. Ct. 5261 (2022) (cleaned up). "In a FOIA case, a

district court is not tasked with uncovering whether there might exist any other documents possibly responsive to the request, but instead, asks only whether the search for the requested documents was adequate." *Id.* at 613 (cleaned up).

Additionally, to carry its burden with respect to claimed Exemptions, the agency must provide "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of the withheld document to which they apply." *Elec. Privacy Info. Ctr. v. DEA*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).  The agency "cannot justify its withholdings on the basis of summary statements that merely reiterate legal standards or offer 'far-ranging category definitions for information,'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013) (quoting *King v. U.S. Dep't of Just.*, 830 F.2d 210, 221 (D.C. Cir. 1987)), but it "may rely on declarations that are reasonably detailed and non-conclusory," *Pinson v. U.S. Dep't of Just.*, 245 F. Supp. 3d 225, 239 (D.D.C. 2017).  While reviewing courts should "respect the expertise of an agency," *Hayden v. NSA/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979), courts review an agency's decision to withhold records de novo and will only endorse that decision if the agency's justification for invoking a FOIA exemption "appears 'logical' or 'plausible,'" *Pinson*, 245 F. Supp. 3d at 239 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).  That said, courts "consistently defer[] to executive affidavits predicting harm to national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003).

## IV.  ANALYSIS

The CIA moves for summary judgment as to the adequacy of its search and the validity of its withholdings under FOIA Exemptions 1, 3, and 6.  By contrast, the Washington Post moves for summary judgment arguing that the CIA's search was inadequate, and that the CIA has not justified its withholdings.  The Court addresses each argument in turn.

### A.  Adequate Search

The parties first disagreement involves the adequacy of the CIA's search for records responsive to the Washington Post's FOIA request.  *See* MSJ at 3–5; Cross-MSJ at 1–2, 18–21; Def.'s Reply at 1–4.  "[A]n adequate search entails a showing that the agency made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Montgomery v. IRS*, 40 F.4th 702, 714 (D.C. Cir. 2022) (cleaned up).  An agency seeking summary judgment "on the basis that it conducted an adequate search . . . must provide a 'reasonably detailed' affidavit describing the scope of that search."  *Pinson*, 245 F. Supp. 3d at 241 (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 313–14 (D.C. Cir. 2003)).  Courts generally "give considerable deference to agency affidavits supporting their searches."  *Id.*

Here, the CIA represents that it searched for records responsive to the Post's FOIA request in "three different records systems."  Blaine Decl. at ¶ 10.  Those record systems include "(1) indices of all archived hardcopy Agency records; (2) electronic versions of all Agency records that have been reviewed and/or compiled for potential public release; and (3) multiple repositories of intelligence reporting from various sources."  *Id.*  Additionally, the CIA explained that "[w]here hard-copy files were identified as possibly containing relevant records, CIA

information management professionals hand-searched those records in their entirety without the use of terms or other filtering mechanisms." *Id.*

The Post argues that the CIA has not shown that it performed an adequate search because, the Post says, the CIA previously stated that it only conducted a search that "overlapped" with the search requested by the Washington Post. *See* Cross-MSJ at 18–20. The Post infers that the CIA did not search for other records that did not overlap. *See id.* at 20. This is so because the CIA previously indicated that it was conducting a related search that it believed "may substantially overlap with any search for records responsive to the Post's request" and that "[a]fter [the] CIA has finished processing and releasing records from that search, it w[ould] then conduct a search for records responsive to the Post's request that the earlier search did not turn up." Joint Status Report of June 15, 2022 at 1–2. The Washington Post argues that those statements imply that the CIA never conducted a supplemental search because the CIA did not say that it conducted a supplemental search in its declaration and because the CIA failed to locate several records that the Washington Post expected the agency to have within its possession. *See* Cross-MSJ at 18–20.

The Court agrees with the Post. The CIA has had the opportunity to specify that it conducted a supplemental search either in its initial declaration or in a supplemental declaration after the Washington Post's briefing, but instead only provided an argument pointing to a conclusory and vague declaration that it performed an adequate search. *See Nat'l Sec. Couns. v. CIA*, No. CV 12-284 (BAH), 2016 WL 6684182, at *16 (D.D.C. Nov. 14, 2016) (rejecting adequacy of CIA's FOIA search where the CIA failed to provide a supplemental declaration clarifying search discrepancy despite the opportunity to do so). The CIA's statement in its responsive brief that it did conduct a supplemental search, *see* Def.'s Reply at 1–2, is not

persuasive because "[s]tatements made by counsel in briefs are not admissible evidence upon which summary judgment may be granted," *Comptel v. FCC*, 945 F. Supp. 2d 48, 60 (D.D.C. 2013).  The Court is thus left unpersuaded that the CIA conducted a supplemental search for records that did not turn up in its initial overlapping search on behalf of the National Archives.

Furthermore, while it is true that the CIA's declaration states that the CIA "conducted thorough and diligent searches" in three different record systems that were likely to turn up documents of "the age and type" requested by the Post, Blaine Decl. at ¶ 10, the CIA does not explain how it searched the electronic records systems.  First, the CIA has not indicated what search terms it used—if any—when searching the electronic versions of agency records or intelligence repositories; while the CIA states that it did not use search terms when searching hard copy records, it says nothing with respect to its search of digital records.  *See id.*  Nor does the CIA explain which employees searched for the records; the CIA merely states that the employees who performed the search were qualified to search those records and have searched the records in the past.  *See id.*  The Court is aware that the CIA has agency historians, *see*, *e.g.*, *Nat'l Sec. Archive v. CIA.*, 752 F.3d 460, 462 (D.C. Cir. 2014) (referencing a CIA historian), yet the CIA does not mention whether it consulted with its historians to determine the whereabouts of these important historical records, *see generally* Blaine Decl. at ¶ 6.

Ultimately, the CIA simply states that it "searched relevant systems of records that contain records subject to the FOIA and that were reasonably calculated to uncover records responsive to Plaintiff's request, and located 32 responsive documents."  *Id.* at ¶ 9.  This conclusory statement could apply to almost any search in response to a request for records and is insufficient to demonstrate that the CIA's search was adequate.  *See Shapiro*, 40 F.4th at 612–13 (explaining that "a reasonably detailed affidavit," includes a description of the "search terms and

the type of search performed"); *Natl'l Sec. Couns.*, 2016 WL 6684182 at *16 (concluding that CIA's search was inadequate where CIA's "declarant averred simply that personnel responsible for conducting searches within the relevant agency components reviewed their own records to attempt to identify documents responsive to [the FOIA] request" because the CIA "provided little information regarding what parameters were used to accomplish the search" (cleaned up)).

Although "the reasonableness of a FOIA search does not turn on whether it actually uncovered every document extant, and the failure of an agency to turn up a specific document does not alone render a search inadequate," *In re Clinton,* 970 F.3d 357, 367 (D.C. Cir. 2020) (internal quotation marks and citation omitted), the CIA's failure to locate a large percentage of the historically significant records that the Post seeks raises serious concerns that the CIA did not perform an adequate search, *Huntington v. U.S. Dep't of Com.*, 234 F. Supp. 3d 94, 107 (D.D.C. 2017) (explaining that courts "have sometimes found that the government's failure to hand over specific documents indicates that a search was inadequate" (referencing *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20 (D.C. Cir. 1998) and *Wolf v. CIA*, 357 F. Supp. 2d 112 (D.D.C. 2004))). Because the CIA has not demonstrated that it conducted a supplemental search for records as it initially stated it would and because the CIA has not explained the manner in which it searched the record systems it did search, the Court concludes that the CIA failed to conduct an adequate search. The CIA must conduct a supplemental search for the missing histories. Accordingly, the CIA's motion is denied, and the Post's motion is granted, in this respect.

## B. Exemption 1

Of the records that the CIA located, the CIA argues that its withholding of 17 records in full and 12 records in part was justified by Exemption 1 because the withheld records "contain classified information related to: classified relationships; intelligence methods; and intelligence

activities and targets." MSJ at 9; Blaine Decl. at ¶ 19. Under FOIA Exemption 1, an agency

may withhold from disclosure documents that are "(A) specifically authorized under criteria

established by an Executive order to be kept secret in the interest of national defense or foreign

policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C.

§ 552(b)(1). Here, the CIA argues that the information it withheld is properly classified pursuant

to Executive Order 13526. Executive Order 13526 states that information is properly classified

if

> (1) an original classification authority is classifying the information; (2) the
> information is owned by, produced by or for, or is under the control of the United
> States Government; (3) the information falls within one or more of the categories
> of information listed in section 1.4 of [the] order; and (4) the original classification
> authority determines that the unauthorized disclosure of the information reasonably
> could be expected to result in damage to the national security, which includes
> defense against transnational terrorism, and the original classification authority is
> able to identify or describe the damage.

Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).

There is no question that the CIA's declarant is an original classification authority who

classified the information, and that the information is owned by the United States Government.

*See* Blaine Decl. at ¶¶ 3, 9; MSJ at 9; *see generally* Cross-MSJ at 9–12. Furthermore, the CIA's

declarant averred that the information falls within section 1.4 because it concerns (1)

"intelligence activities (including covert action)," (2) "intelligence sources or methods," and/or

(3) "foreign relations or foreign activities of the United States." Blaine Decl. at ¶ 17.

Specifically, the CIA explains that the records "contain information that would reveal specific

intelligence targets, the locations of CIA activities—historically and presently, and the targets of

specific CIA operations." *Id.* at ¶ 20. The records "contain specific types of intelligence

methods, as well as policies and procedures for implementing and utilizing those intelligence

methods, and a historical accounting of the application of those methods." *Id.* at ¶ 21. And the

records "discuss, and in some cases extensively detail, the process and policies for working with foreign services, foreign individuals, and clandestine assets who aid the CIA in its intelligence operations." *Id.* at ¶ 22. The Washington Post does not appear to dispute that the withheld information concerns these topics, *see generally* Cross-MSJ at 9–12, and the Court is satisfied on this record that the records contain information that is covered by section 1.4.

The rub starts with whether disclosure of the records reasonably could be expected to result in damage to the national security. *See* Exec. Order No. 13,526, 75 Fed. Reg. at 707. The CIA says that releasing the records would damage national security because disclosure "could significantly impair the CIA's ability to carry out its core mission of gathering and analyzing foreign intelligence and counter intelligence and conducting intelligence operations, thereby damaging the national security." *See* Blaine Decl. at ¶¶ 19, 20–22; MSJ at 12. For example, the CIA contends that disclosure "would reveal specific intelligence targets, the locations of CIA activities historically and presently, and the targets of specific CIA operations." Blaine Decl. at ¶ 20. Even old information, the CIA says, could provide "insight to our adversaries of what the CIA has done in the past as related to what it is capable of or planning to undertake in the future." *Id.* Moreover, the CIA says, the records would reveal the identities of "foreign partners who do business with the Agency" and the CIA's "process and policies for working with foreign services, foreign individuals, and clandestine assets who aid the CIA in its intelligence operations." *Id.* at ¶ 22.

The Washington Post raises three counterarguments. First, the Post disagrees with the CIA's assessment that disclosure would create a risk of harm to the national security given the records' age and nature. *See* Cross-MSJ at 10–11. Second, the Post contends that the CIA violated Executive Order 13526 by classifying the records "indefinitely." *See id.* at 10. And

third, the Post argues that the CIA violated Executive Order 13526 by failing to assess whether the public interest outweighed the need to redact the documents. *See id.*

While it is true that the records the CIA has withheld are old, "this Court is not in a position to second-guess an agency's classification decisions absent a contradiction on the record or evidence of bad faith." *Moore v. CIA*, No. 1:20-CV-1027-RCL, 2022 WL 2983419, at *6 (D.D.C. July 28, 2022) (rejecting plaintiff's argument that CIA "records [we]re too old to justify continued classification"). The D.C. Circuit has "consistently deferred to executive affidavits predicting harm to national security, and ha[s] found it unwise to undertake searching judicial review." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011) (quoting *Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 927). While some of the CIA's intelligence sources, methods, and international relationships have surely become outdated since these records were created, it is possible that the sources, methods, and relationships that the CIA has withheld from disclosure remain part of the CIA's arsenal to protect the national security. *See Shapiro v. U.S. Dep't of Just.*, 893 F.3d 796, 799 (D.C. Cir. 2018) ("[I]nvoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)); *Schaerr v. U.S. Dep't of Just.*, 69 F.4th 924, 929 (D.C. Cir. 2023) (same).

Moreover, the fact that the withheld information appears innocuous to the Washington Post does not necessarily undermine the CIA's explanation in this case because the Court must "accord[s] substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *ACLU*, 628 F.3d at 619 (quoting *Wolf*, 473 F.3d at 374); *CIA v. Sims*, 471 U.S. 159, 180 (1985) ("[I]t is the responsibility of the Director of [the CIA], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the [CIA's]

intelligence-gathering process."). As the CIA explains, even seemingly innocuous records, when viewed in context, may reveal information that can compromise the national security. *See* MSJ at 8.

Nevertheless, the Post has identified several examples of redacted information that appear in context to be completely innocuous—and which the CIA does not specifically address. For instance, the Post points out that the CIA has redacted the number of clerical employees who worked for the CIA's Eastern European branch in the 1950s, the number of CIA personnel who had native fluency in Hungarian in the 1950s, the dollar amount that the National Security Council authorized in 1957 to support the forces of Maludin Simbolon in Indonesia, and the number of stenographers that the Missile Collection Committee had working for it in the 1950s. *See* Cross-MSJ at 11.

The Court is hard pressed to understand how redaction of these seemingly innocuous pieces of information serves to protect the national security. Although the Court "accord[s] substantial weight to [the CIA's] affidavit concerning the details of the classified status of the disputed record," *ACLU*, 628 F.3d at 619 (quoting *Wolf*, 473 F.3d at 374), the CIA's declarations must at least "afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding," *King*, 830 F.2d at 218. The CIA's mosaic argument—that every small piece of information can be used to harm national security—has no limit and could theoretically apply to all information no matter how innocuous. *See Shapiro v. U.S. Dep't of Just.*, 239 F. Supp. 3d 100, 115 (D.D.C. 2017) (explaining that mosaic theory has limits and can't be used to hide innocuous information). The Court concludes, therefore, that the CIA's declaration has not sufficiently explained how release of this information could harm the national security. Be that as it may, the Court understands

that a more detailed explanation of how disclosure would affect the national security comes with its own risks. *See Perioperative Servs. & Logistics, LLC v. Dep't of Vets. Affs.*, 57 F.4th 1061, 1067 (D.C. Cir. 2023) (stating that the government may be hesitant to explain its withholding because the explanation may itself reveal sensitive information). Accordingly, the Court denies the CIA's motion *without prejudice* and orders the CIA to provide a declaration *ex parte in camera* (and classified if necessary) that explains how the apparently innocuous information that the Washington Post has identified could cause the harms that the CIA asserts.

The Court continues briefly to address the Washington Post's additional arguments. Contrary to the Posts assertion, *see* Cross-MSJ at 10, the CIA has not improperly classified these records "indefinitely." It is true that the records have been classified for many years, but the CIA has continued their classification using the proper classification procedures authorized by Executive Order 13526. *See, e.g., James Madison Proj. v. CIA*, No. 18-cv-3112-KBJ, 2020 WL 5653577, at *2 (D.D.C. Sept. 23, 2020) (concluding that the CIA properly exempted records from automatic declassification at 50-year mark). Specifically—while Executive Order 13526 contains a declassification provision that usually mandates automatic declassification after 50 years—the Executive Order permits agency heads to "exempt . . . specific information from declassification at 50 years." Exec. Order No. 13,526, 75 Fed. Reg. at 717. Here, the CIA "has exempted the type of information at issue . . . from automatic declassification at 50 years" through its 2018 Declassification Guide. Blaine Decl. at ¶¶ 15-16; *see also Assassination Archives & Rsch Ctr., Inc. v. CIA*, No. 18-5280, 2019 WL 691517, at *1 (D.C. Cir. Feb. 15, 2019) (holding that CIA properly exempted records from declassification after 50 years in the interests of national defense). Accordingly, these records are exempted from the Executive Order's declassification provision. And contrary to the Post's assertion, *see* Pl.'s Reply at 6, an

agency's failure "to establish a declassification timeline . . . does not prevent the agency from relying on FOIA Exemption 1," *Mobley v. CIA*, 924 F. Supp. 2d 24, 49 (D.D.C. 2013). The CIA has demonstrated that it considered declassification and ultimately concluded that classification continued to be necessary for the information that it has withheld.

Nor does the CIA's failure to explicitly address the public interest undermine its withholdings here. As courts in this District have explained, the decision to declassify a document pursuant to the public interest "is discretionary" and reserved for "exceptional" cases. *Canning v. U.S. Dep't of State*, 134 F. Supp. 3d 490, 505 (D.D.C. 2015) (rejecting requirement that agency need explicitly state that public interest does not merit disclosure). If the CIA determines that classification is appropriate under Executive Order 13526, that is sufficient. The Court understands the CIA's position to indicate that it considered whether the case was an exceptional circumstance and whether the public interest merited disclosure and decided to the contrary. Accordingly, the Court denies both the CIA and the Post's motions without prejudice.

### C. Exemption 3

The CIA next contends that it properly withheld or redacted certain records under Exemption 3. Blaine Decl. at ¶ 25; MSJ at 14–17. Under Exemption 3, an agency can withhold from disclosure matters that are "specifically exempted from disclosure by statute," provided that the statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). "Under that exemption, the CIA need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson*, 565 F.3d at 865 (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 761–62 (D.C. Cir. 1990)).

1.  The National Security Act

Here, the CIA argues that the National Security Act is an exemption statute that bars disclosure of the information the CIA seeks to withhold because the Act protects from disclosure "intelligence sources and methods."  *See* MSJ at 16 (quoting 50 U.S.C. § 3024(i)(1)); Blaine Decl. at ¶ 26–29.  The D.C. Circuit has recognized that the National Security Act is an exemption statute for purposes of Exemption 3.  *See DiBacco v. U.S. Dep't of Army*, 926 F.3d 827, 834 (D.C. Cir. 2019); *see also ACLU*, 628 F.3d at 619; *Larson*, 565 F.3d at 865.  And the D.C. Circuit has treated § 3024(i)(1) of the National Security Act broadly, "holding that material is properly withheld under the Act if it 'relates to intelligence sources and methods,'" *Leopold v. CIA*, 106 F. Supp. 3d 51, 57 (D.D.C. 2015) (quoting *Larson*, 565 F.3d at 865), or if it "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods," *id.* (quoting *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980)); *see also Sims*, 471 U.S. at 169 (explaining that "Congress entrusted [the CIA] with sweeping power to protect its 'intelligence sources and methods'" when it passed the National Security Act); *id.* at 180 ("[I]t is the responsibility of the Director of [the CIA], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process.").

The CIA represents that the records it has withheld "contain classified information related to intelligence activities and targets, intelligence sources and methods of collection."  Blaine Decl. at ¶ 15.  For instance, the CIA's *Vaughn* index explains that many of the withheld records involve "historical accounting" or "historical analysis" that could reveal "intelligence sources and methods, including classified relationships and information pertaining to foreign relations or foreign activities of the United States."  *See Vaughn* Index, Ex. B, ECF No. 19-3.  The CIA also

represents that the redacted material includes "certain techniques used to protect methods used to secure agency facilities, protect or support Agency officers, and control dissemination of information" the disclosure of which "would reveal intelligence methods pertaining to dissemination controls and protection of information." Blaine Decl. at ¶ 15. The Washington Post disagrees with the CIA's application of the National Security Act because it contends that release could not "possibly be expected to lead to the disclosure of an intelligence source or method" given the records' age and the nature of the redacted information. *See* Cross-MSJ at 13; Pl.'s Reply at 9. Specifically, the Post argues that certain information that the CIA has redacted, such as an alternative name for the "Hungarian Refugee Exploitation Program" in the 1950s or the number of teletype pages of information sent to a temporary New York CIA office related to then President-elect Richard Nixon in the late 1960s, is too benign to possibly compromise intelligence sources or methods. *See* Cross-MSJ at 13.

Although the records at issue are old, it is possible that the intelligence methods and institutional relationships disclosed therein have not gone stale and that release of these records would harm intelligence sources and methods as contemplated by the statute. *See, e.g., Assassination Archives & Rsch. Ctr., Inc. v. CIA*, 317 F. Supp. 3d 394, 403 (D.D.C. 2018) (applying National Security Act and Exemption 3 to documents that were over 50 years old because withholding would "protect intelligence sources and methods from unauthorized disclosure" (citation omitted)); *Maynard v. CIA*, 986 F.2d 547, 555 & n.6 (1st Cir. 1993) (applying National Security Act and Exemption 3 to redacted paragraph containing information that was 30 years old and explaining that "[c]ourts have generally rejected the contention that the mere age of intelligence information rules out Exemption 3"). And although it may be difficult to credit, access to such seemingly innocuous information could theoretically facilitate

deductions that may reveal intelligence sources or methods.  *See Sims*, 471 U.S. at 177 ("intelligence work . . . often involves seemingly innocuous sources"); *id.* (explaining that when exercising its authority under the National Security Act, the CIA "has power to withhold superficially innocuous information on the ground that it might enable an observer to discover the identity of an intelligence source."); *see also Int'l Couns. Bureau v. CIA*, 774 F. Supp. 2d 262, 271 & n.5 (D.D.C. 2011) (agreeing with the "CIA that even the release of seemingly insignificant or benign information could have significant adverse effects when combined with other data." (internal quotation marks and citation omitted)); *Fitzgibbon*, 911 F.2d at 763 ("This Court has established that in considering the potential harm arising from disclosure of a source or method, '[w]e must take into account . . . that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance itself.'" (internal quotation marks and citation omitted) (alteration in original)).

The CIA, however, has not explained how release of the seemingly innocuous information identified by the Post could harm the national security.  *See King*, 830 F. 2d at 218 (explaining that agency affidavit must permit "district court an adequate foundation to review, the soundness of the withholding").  Without additional detail explaining how release of this information could harm national security, the Court is hard pressed to determine whether the CIA's assertion of harm should be credited.  Accordingly, the Court concludes that the CIA has failed its burden to show that the redactions protect against harms to national security.  The Court denies the CIA's motion in this respect *without prejudice* and orders the CIA to explain how these withholdings would protect the national security in its *ex parte in camera* declaration. The Court also denies the Post's cross-motion.

## 2. The CIA Act

The CIA also argues that some of the information it has redacted is protected by the CIA Act and that the CIA Act is an exemption statute under FOIA Exemption 3.  *See* Blaine Decl. at ¶ 27.  The CIA Act exempts the CIA from "the provisions of any . . . law[s] which require the publication or disclosure of the organization or functions of the Agency, or of the names, official titles, salaries, or numbers of personnel employed by the Agency."  50 U.S.C. § 3507.  This Circuit has recognized that the CIA Act is an exemption statute under FOIA Exemption 3.  *See DiBacco*, 926 F.3d at 834; *see also Assassination Archives*, 2019 WL 691517, at *1 (concluding that redactions of "personally identifying information were properly withheld pursuant to FOIA Exemption 3, by way of the CIA Act" in case where records were over 50 years old).  The CIA represents that it "withheld identifying information such as names, titles, identification numbers, functions, and organizational information related to the Agency and its employees."  Blaine Decl. at ¶ 27; *see also Vaughn* Index.  The Court finds plausible the agency's assertion that revealing the agency information sought to be withheld would constitute a "disclosure of the organization, functions, [or] names . . . of personnel employed by the Agency."  50 U.S.C. § 3507.[3]  Accordingly, the Court concludes that the CIA's withholdings under Exemption 3 and pursuant to the CIA Act are justified.

### D.  Exemption 6

Lastly, the CIA argues that its partial withholding of fifteen records under Exemption 6 is justified.  *See* MSJ at 17 n.1; Blaine Decl. at ¶ 31.  The Court concludes that these partial withholdings are justified.

---

[3] The Court also observes that the Post does not challenge the CIA's redactions of "identifying information . . . related to the Agency and its employees."  Cross-MSJ at 9 n.3.

Exemption 6 shields from disclosure "files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The Exemption requires courts to "balance the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny." *Billington v. U.S. Dep't of Just.*, 301 F. Supp. 2d 15, 19 (D.D.C. 2004) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 175 (1991)). Here, the CIA asserts that "release of the redacted names and other identifying information is reasonably likely to subject those individuals, or those associated with them, including surviving relatives, to increased harassment or threats, or unwanted contact by the media and other interested parties, based on their association with the CIA." Blaine Decl. at ¶ 31. By contrast, the Post asserts that only a de minimis privacy interest is at stake and that, therefore, disclosure is warranted. *See* Cross-MSJ at 15. Privacy interests are minimal, the Post says, because the information relates to individuals who are already known to be associated with the CIA. *See id.* at 16.

The balance weighs more heavily on the side of privacy interests than the interest in public disclosure. Individuals, and family members of deceased individuals, who were associated with the CIA have a privacy interest in preventing the disclosure of those individuals' association with the CIA, *see Mobley*, 924 F. Supp. 2d at 70 (close relatives of deceased individuals retain privacy interest after decedent's death), and there is some public interest in keeping scrutiny away from CIA personnel, *see Assassination Archives*, 317 F. Supp. 3d at 404 ("[T]he fact that Congress has seen fit to make the personal information of CIA staff members statutorily inaccessible also demonstrates the public's interest in CIA personnel avoiding personal scrutiny for their public service." (citing 50 U.S.C. § 3507)). Although "the privacy interest in nondisclosure of identifying information may be diminished where the individual is deceased," *Schoenman v. FBI*, 573 F. Supp. 2d 119, 151 (D.D.C. 2008) (quoting *Schrecker v.*

*U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003)), and "the weight [of privacy] interest[s] fade[] considerably as decades pass," *Hall v. CIA*, 268 F. Supp. 3d 148, 163 (D.D.C. 2017), "the D.C. Circuit has repeatedly held that the close relatives of a deceased person retain a certain amount of privacy interests after the decedent has passed away," *Mobley*, 924 F. Supp. 2d at 70 (collecting cases).

Here, the relatives of deceased individuals may have only a modest privacy interest in the withholding of information, but the Washington Post has not put forth a countervailing public interest in the release of the information, *see generally* Cross-MSJ at 15–16; Pl.'s Reply at 10–11, and "even a modest privacy interest, outweighs nothing every time," *Mobley*, 924 F. Supp. 2d at 71 (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989)). Nor does the Court perceive that release of the information would serve "FOIA's central purpose—to ensure that the *Government*'s activities be opened to the sharp eye of public scrutiny," *Fed. Lab. Rels. Auth. v. U.S. Dep't of Treasury, Fin. Mgmt. Serv.*, 884 F.2d 1446, 1451 (D.C. Cir. 1989), because "information about private citizens . . . reveals little or nothing about an agency's own conduct," *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989); *Insider Inc. v. GSA*, 92 F.4th 1131, 1136 (D.C. Cir. 2024) (explaining that public interest in disclosure "cannot sound in activities exclusively concerning . . . *former* government actors"). Moreover, to the extent that the redacted information pertains to details other than whether a deceased individual was associated with the CIA, that information may constitute a greater than modest invasion of privacy.[4] This is so because if the individual

---

[4] The Washington Post specifically identifies three redactions under Exemption 6 that it believes are inappropriate: (1) employee signatures; (2) an alleged photograph; and (3) an individual's professional affiliations. Courts in this District have concluded that there is a "substantial privacy interest . . . in the protection of . . . hand-written signatures." *James v. U.S. Dep't of Just.*, Civil Action No. 19-00513, 2020 WL 1140675, at *4 (D.D.C. Mar. 9, 2020)

associated with the CIA is still alive, or if the redacted information does more than reveal that individual's association with the CIA, that information may cause the individual to be further harassed or may reveal personal details about the individual that would cause surviving relatives embarrassment or harassment.

The CIA has also sufficiently demonstrated that release of the information would harm interests that Exemption 6 protects because it has explained that "[t]he release of the redacted names and other identifying information is reasonably likely to subject those individuals, or those associated with them, including surviving relatives, to increased harassment or threats, or unwanted contact by the media and other interested parties, based on their association with the CIA."  Blaine Decl. at ¶ 31.  This Court has previously upheld the CIA's withholding of personal

---

(collecting cases); *see also Howard v. United States*, 435 F. Supp. 3d 198, 205 (D.D.C. 2020) ("redaction of the signatures is hardly controversial").  The District Court in *James* agreed with the Government that revealing individuals' signatures "could expose . . . individuals to 'an unwarranted invasion of their personal privacy, leading to efforts to use their signatures and initials for identity theft, other fraudulent purposes, or subject these individuals to harassment or harm.'"  *James*, 2020 WL 1140675, at *3; *Brannum v. Dominguez*, 377 F. Supp. 2d 75, 84 (D.D.C. 2005) (The "court agrees with defendant that release of this information would . . . create opportunity for misappropriation of the signatures . . . ." (cleaned up)). Moreover, there is no indication that revealing the signatures "would contribute significantly to public understanding of the operations or activities of the government."  *James*, 2020 WL 1140675, at *3; *Brannum*, 377 F. Supp. 2d at 84 ("The public interest involved in the disclosure of this information would most likely not shed any light on the [agency's] performance."). Accordingly, the signatures are properly withheld under Exemption 6.

With respect to the alleged photograph, the CIA contends that the redaction contains "personally identifiable information, such as names, signatures, and other identifying information, in which the individuals maintain a cognizable privacy interest."  Blaine Decl. at ¶ 31.  Consistent with the reasons explained above, the photograph is also exempt from disclosure.  Lastly, as courts in this District have concluded, individuals have a privacy interest in nondisclosure of their professional affiliations because those affiliations may subject them to harassment.  *See Rojas-Vega v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 300, 310 (D.D.C. 2018); *see also Rosenberg v. U.S. Dep't of Immigr. & Customs Enf't*, 13 F. Supp. 3d 92, 118 (D.D.C. 2014) (protecting "professional titles/job identifiers").  The individuals associated with the CIA—as well as those individuals' relatives—have a privacy interest in their professional affiliations.  The professional affiliations are exempt.

identifying information where release would risk subjecting individuals to harassment or unwanted contact from third parties.  *See Leopold v. CIA*, 380 F. Supp. 3d 14, 30 (D.D.C. 2019).  Accordingly, the Court concludes that the CIA may properly withhold this information under FOIA Exemption 6.

### E.  Segregability

The Court must also ensure that the CIA has taken the "reasonable steps necessary to segregate and release nonexempt information."  5 U.S.C. § 552(a)(8)(A)(ii)(I); *Porup v. CIA*, 997 F.3d 1224, 1238 (D.C. Cir. 2021) (explaining that "trial court must make a segregability finding if a federal agency has redacted or withheld documents pursuant to FOIA exemptions").  That said, FOIA "does not call for parsing [a record] line-by-line or segregating material dispersed throughout the document.  Instead, the emphasis is on segregation of non-exempt material found in logically divisible sections."  *Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Just. Exec. Off. for U.S. Att'ys*, 844 F.3d 246, 257 (D.C. Cir. 2016) (cleaned up).  Here, the CIA represents that it "conducted a document-by-document and line-by-line review" and "released all reasonably segregable non-exempt information."  Blaine Decl. at ¶ 33.  The D.C. Circuit has previously endorsed an agency's segregation of information where the agency attested that it had "conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information within responsive records."  *Porup*, 997 F.3d at 1239 (cleaned up); *see also Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (concluding that an agency "appropriately segregated exempt and non-exempt portions" of responsive records where it "conducted a line-by-line review, determined that some non-exempt, factual information within [the records] could be segregated for release, and redacted only" exempt information (cleaned up)).  Therefore, the Court concludes that the CIA's "sworn

statements sufficiently establish that 'no portions of the [fully] withheld documents may be segregated and released.'" *Porup*, 997 F.3d at 1239 (citation omitted).  Accordingly, "[the Court] find[s] that the Agency has met its segregability obligations." *Id.*

## V. CONCLUSION

The Court concludes that the CIA failed to conduct an adequate search for responsive records and that the CIA has not satisfied its burden justifying its withholdings pursuant to Exemption 1 and its withholdings pursuant to Exemption 3 under the National Security Act.  The CIA has satisfied its burden with respect to Exemption 3 under the CIA Act and Exemption 6. For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 19) is **GRANTED IN PART** and **DENIED IN PART WITHOUT PREJUDICE** and Plaintiffs' cross motion for summary judgment (ECF No. 20) is **GRANTED IN PART** and **DENIED IN PART WITHOUT PREJUDICE**.  The CIA is further instructed to submit an *ex parte in camera* declaration (classified if necessary) explaining its withholdings pursuant to Exemptions 1 and 3 before filing any renewed motion for summary judgment.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 7, 2024                                    RUDOLPH CONTRERAS
                                                                        United States District Judge